In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 20-1245

USA GYMNASTICS,

*Plaintiff-Appellee,*

*v.*

LIBERTY INSURANCE UNDERWRITERS, INC.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01306-RLY-MPB — **Richard L. Young**, *Judge.*

_____

ARGUED NOVEMBER 9, 2020 — DECIDED FEBRUARY 25, 2022

_____

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN, *Circuit Judges*.

PER CURIAM. Larry Nassar sexually assaulted hundreds of girls and young women over decades during his involvement with USA Gymnastics, Inc. (USAG), the non-profit organization which governs the sport in the United States. As a result of Nassar's abuse, USAG has been sued numerous times and investigated by Congress and federal and state authorities. USAG sought financial help with its defense from various

insurers, including Liberty Insurance Underwriters, Inc. (Liberty), with which USAG had a claims-made, directors and officers (D&O) liability insurance policy.

USAG's claims ripened into an insurance-coverage lawsuit in Indiana state court which was removed to federal court under diversity jurisdiction. The Nassar-related litigation and investigations forced USAG into bankruptcy. In an adversary proceeding, the bankruptcy court issued proposed findings and conclusions, including that the initial Nassar-related claims were timely made and that a wrongful-conduct exclusion applied to only those claims for which Nassar was criminally convicted. The district court adopted those findings and conclusions in a January 13, 2020 order.

Liberty appeals, and we have jurisdiction because that order has the "practical effect" of an injunction under 28 U.S.C. § 1292(a)(1). We conclude that USAG's claims were timely made during the policy period, and that the wrongful conduct exclusion in the Liberty policy applies to ten instances of Nassar's sexual abuse, but not to all claims related to his abuse. We also decide that a bodily injury exclusion in the policy does not preclude coverage, and that insurance coverage is proper for various government investigations and other matters. Finally, the policy contains a $250,000 "Third Party EPL" sublimit. The bankruptcy court should have considered extrinsic evidence about the meaning of this endorsement, so we remand for further proceedings on that question.

## I. Background

### A. Factual[1]

Larry Nassar was a physician and professor at Michigan State University (MSU). In 1987, he began to volunteer in a medical capacity for USAG. Over the decades, his involvement in the organization grew, and he became a central figure in USAG's program, drafting medical guidelines, lecturing at conferences, assisting other medical personnel, treating hundreds of athletes, and traveling with the U.S. Olympic team.

The world now knows that instead of generosity or patriotism, Nassar's involvement with USAG was motivated by his desire to gain access to female athletes whom he victimized. He persuaded his victims that his methods of abuse were medically necessary, and on thousands of occasions over almost 30 years, Nassar sexually assaulted and abused hundreds of young women and girls under the guise of medical treatments.

Some dispute exists about when and to whom allegations against Nassar were first made. Several athletes allege they filed complaints against him as early as 1998 and in the early 2000s. USAG says those allegations were made to individual member gyms, not to USAG. In June 2015, a coach notified USAG's senior vice president that an athlete had complained about how and where Nassar had touched her. This allegation

---

[1] This factual background is taken from the records of the bankruptcy and district courts. In the bankruptcy court adversary proceeding, the parties cross-moved for summary judgment. For the issues resolved here, to the extent factual disputes exist, inferences are drawn for the non-moving party. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797–98 (7th Cir. 2017).

set off a series of events that led to the FBI's involvement in July 2015. USAG received its first written demand letter from a former athlete on May 25, 2016.

In September 2016, the *Indianapolis Star* published an article in which two former gymnasts accused Nassar of sexual abuse. That month, MSU terminated Nassar. The day before he was fired, Nassar took his work laptop to a computer store and paid to wipe all its content. The next day, hard drives containing thousands of images of child pornography were found in Nassar's trash. Nassar was arrested in December 2016, and the next year he was convicted in federal court of possessing child pornography, including recordings he had made of his abuse. He received consecutive sentences totaling 60 years.

Nassar was also prosecuted in Michigan state court for criminal sexual conduct in two counties. He signed written plea agreements in Ingham County and in Eaton County, and he agreed under oath to their terms on the record. In Ingham County, he pleaded guilty to seven counts of first degree criminal sexual conduct, and in Eaton County he pleaded guilty to three counts of first degree criminal sexual conduct. Other charges were dismissed in exchange for compliance with the plea agreements.[2] The state also agreed not to further prosecute Nassar for 115 other criminal sexual conduct charges reported to the MSU police, listed in an appendix to the plea agreements.

The plea agreements also provided that Nassar waived any and all defenses, including that his criminal conduct was

---

[2] Six other counts in the Ingham County prosecution had been previously dismissed at preliminary examination.

for a legitimate medical purpose. Nassar also agreed that at sentencing, testimony from any victim could be considered, including all victim impact statements. At the Ingham County sentencing hearing—which lasted seven days—156 of 265 victims spoke or contributed statements to the court. At the Eaton County sentencing—which lasted three days—65 victims spoke or contributed statements.

Nassar was sentenced to 40–175 years in Ingham County, and to 40–125 years in Eaton County. These state sentences were ordered to be served concurrently, but consecutive to Nassar's federal sentence. Both the federal and state convictions resulted in effective life sentences for Nassar.

As a result of Nassar's sexual abuse, USAG has faced numerous Congressional, federal, and state investigations. USAG has also been named in numerous lawsuits and is at risk of decertification as the national governing body of gymnastics by the United States Olympic & Paralympic Committee ("USOPC").

This appeal concerns USAG's claims against one insurer, Liberty. USAG purchased a claims-made D&O policy from Liberty, which had a coverage period of May 16, 2016 through May 16, 2017. That policy, the coverage of which is at issue here, defines many of the terms the parties dispute. The policy also contains what has been termed a wrongful conduct exclusion (also called an intentional-acts exclusion) which bars coverage for claims "made against any **Insured**"[3] "based upon, arising from, or in any way related to" "any deliberately dishonest, malicious, or fraudulent act," "or any willful

---

[3] Defined terms are bolded in the policy, a convention this opinion continues.

violation of law by any **Insured**," provided such conduct was "finally adjudicated" and "in fact occurred."

### B. Procedural

In 2018, USAG sued seven insurers, including Liberty, in Indiana state court, alleging they had a duty to defend the lawsuits USAG faced and to pay expenses incurred from the investigations. The insurers removed the case to the U.S. District Court for the Southern District of Indiana under diversity jurisdiction, 28 U.S.C. § 1332. The combined weight of the lawsuits and the investigations forced USAG to file for bankruptcy under Chapter 11. This insurance coverage litigation took place in an adversary proceeding as part of that bankruptcy. The district court retained jurisdiction over the matter under 28 U.S.C. § 1334(b).

The parties cross-moved for summary judgment. USAG sought coverage on various claims, including what are termed, cumulatively, the "Nassar-related claims": "athlete lawsuits" by hundreds of gymnasts seeking to hold USAG responsible for allowing the abuse to take place, causing them to suffer physical, mental, and emotional damage; "revocation lawsuits" by coaches and owners of gyms affiliated with USAG alleging financial losses due to USAG's handling of Nassar; the costs of complying with Indiana, Congressional, and USOPC investigations; and the costs related to the deposition of and grand jury testimony by a USAG employee, Amy White.

In response, and in its own motion, Liberty argued (among other things) that none of the Nassar-related claims are covered under the policy. Liberty also contended that the first of the claims predated the coverage period. To Liberty,

the conduct exclusion barred coverage for all the claims because Nassar, an insured, engaged in wrongful conduct finally adjudicated in his criminal cases, or that the claims were at least related to that conduct.

In non-core matters, a bankruptcy court is tasked with preparing proposed findings of fact and conclusions of law for the district court's review. 28 U.S.C. § 157(c)(1). The court proposed that partial summary judgment be granted to each party. Among its findings, the bankruptcy court concluded that the first written demand against USAG relating to Nassar's abuse occurred on May 25, 2016, within the policy period. That court also found that Liberty had a duty to defend all the Nassar-related claims. Rejecting Liberty's policy interpretation as too broad, the court submitted that the wrongful conduct exclusion barred coverage for only those suits seeking damages for the ten counts of sexual abuse for which Nassar was convicted.

The court also considered other disputes now before us. The policy includes a bodily injury exclusion that barred coverage for physical, emotional, and mental damages, but an exception limits the exclusion to certain types of cases. The policy also had a $250,000 sublimit for "Third-Party EPL" (Employment Practices Liability, although the acronym is not defined in the policy). The bankruptcy court concluded that the third-party claim exception to the bodily injury exclusion preserved coverage for the "athlete lawsuits"; that the various investigations were both formal and for wrongful acts, placing them within the scope of coverage; and that the $250,000 sublimit for such claims was ambiguous and unenforceable.

Under Federal Rule of Bankruptcy Procedure 9033(b), Liberty objected to the bankruptcy court's findings and

conclusions. The district court reviewed de novo the bank-
ruptcy court's proposed findings and conclusions under Rule
9033(d), and overruling Liberty's objections it adopted those
findings and conclusions in full in its January 13, 2020 written
order. Those portions of the court's order in which summary
judgment was granted are reviewed de novo. *Ace Am. Ins. Co.
v. RC2 Corp.*, 600 F.3d 763, 766 (7th Cir. 2010).

### C. Jurisdiction

The order Liberty challenges before us is not a final deci-
sion appealable pursuant to 28 U.S.C. § 1291. Rather, Liberty
appeals under 28 U.S.C. § 1292(a)(1), which gives the courts
of appeals jurisdiction over "[i]nterlocutory orders of the dis-
trict courts … granting, continuing, modifying, refusing or
dissolving injunctions." "We construe the statute narrowly, as
a limited exception." *Chicago Joe's Tea Room, LLC v. Village of
Broadview*, 894 F.3d 807, 812 (7th Cir. 2018) (citations omitted).
Where, as here, the district court has not entered a formal in-
junction under Federal Rule of Civil Procedure 65, appellate
jurisdiction exists if the order has the "practical effect" of an
injunction. *See Abbott v. Perez*, 138 S. Ct. 2305, 2319–20 (2018).

To determine whether an order is injunctive, the nature of
the order's relief is assessed. *See Ramara, Inc. v. Westfield Ins.
Co.*, 814 F.3d 660, 669–70 (3d Cir. 2016) (applying functional
test to determine whether order directing insurer to defend
insured was injunction and immediately appealable). The or-
der here includes legal relief, as the bankruptcy court ruled
that Liberty must reimburse USAG for its defense costs and
interest. But the primary effect of the order is to render equi-
table relief, declaring Liberty's duty to defend the Nassar-re-
lated claims against USAG and mandating that Liberty
provide USAG a complete defense.

"[M]andatory interlocutory orders are considered injunctions reviewable under § 1292(a)(1) only if they effectively grant or withhold the relief sought on the merits and affect one party's ability to obtain such relief in a way that cannot be rectified by a later appeal (that is, irreparably)." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 490 (7th Cir. 2012) (internal quotation marks omitted). The order here granted relief on the merits, as Liberty's duty to defend USAG was the primary topic of debate in the adversary action. Each party also offers examples of how the order creates irreparable injury not able to be rectified by a later appeal. Liberty is obligated to defend USAG going forward, requiring payment of an uncertain amount of defense costs and fees. If the order is incorrect, Liberty's chance at recovery may be limited because USAG is bankrupt. For USAG, a nonprofit, the direction to Liberty to defend is injunctive because it prevents or remedies irreparable harm to USAG, the policyholder, which has fronted substantial legal fees and costs. A reversal on appeal would reimpose serious financial stress and uncertainty. While the parties quibble over the nature of the harm each suffers, they reach the same conclusion that each suffers "serious and irreparable harm" from the order, which is injunctive in nature.

An order "is properly characterized as an 'injunction' when it substantially and obviously alters the parties' preexisting legal relationship." *Jamie S.*, 668 F.3d at 490 (quoting *Jones-El v. Berge*, 374 F.3d 541, 544 (7th Cir. 2004)). The order here does so by granting equitable relief, directing the prospective duty to defend with undetermined fees and costs, and resulting in serious and perhaps irreparable harm warranting immediate review. While cautious not to overread this exception, *see Chicago Joe's Tea Room*, 894 F.3d at 812, the nature of the equitable relief granted here effectively renders

the order a reviewable injunction. The "practical effect" test is met here to invoke this court's jurisdiction to permit this appeal under 28 U.S.C. § 1292(a)(1).

Litigation in the bankruptcy and district courts is ongoing. During the pendency of this appeal, the district court denied Liberty's motion for partial judgment under Federal Rule of Civil Procedure 54(b), or in the alternative to certify the order now before us as an interlocutory appeal under 28 U.S.C. § 1292(b). It also denied USAG's motion to certify issues to the Indiana Supreme Court, including an issue before us—the interpretation of the policy's wrongful conduct exclusion. USAG was granted partial judgment under Rule 54(b) against Liberty on USAG's claim for reimbursement of past attorneys' fees for defense of the Nassar-related matters, and that judgment has been appealed. That award shows the substantial and obvious alteration in the parties' relationship. For these reasons, this court has appellate jurisdiction to review the bankruptcy court's findings and conclusions as adopted in the district court's order.

**D.  Indiana Insurance Law**

The parties agree that Indiana substantive law controls, and given that this case comes to us under diversity jurisdiction, we follow that law. *Medical Protective Co. of Fort Wayne v. American Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018).

Under Indiana law, insurance policies are interpreted "from the perspective of an ordinary policyholder of average intelligence." *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009) (citations and quotation omitted). "Although special rules of construction have developed for interpreting

insurance policies as a result of the disparity in bargaining power between insurers and insureds, insurance contracts are generally governed by the same rules of construction as other contracts." *Everett Cash Mut. Ins. Co. v. Taylor*, 926 N.E.2d 1008, 1012 (Ind. 2010) (citing *Bradshaw*, 916 N.E.2d at 166).

"[C]lear and unambiguous language in an insurance policy should be given its plain and ordinary meaning." *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012 (citing *Cinergy Corp. v. Assoc. Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 574 (Ind. 2007)); *see also Bradshaw*, 916 N.E.2d at 166. "Ambiguity exists when a policy is susceptible to two or more reasonable interpretations." *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012–13 (citing *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002)). "That is, an insurance policy will be found to be ambiguous in cases where reasonable people would differ as to the meaning of its terms." *Id.* "The fact that the parties disagree over the meaning of the contract does not, in and of itself, establish an ambiguity." *Id*. (citation omitted); *see also Beam*, 765 N.E.2d at 528.

"[W]here there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured." *Nat'l Collegiate Athletic Ass'n v. Ace American Ins. Co.*, 151 N.E.3d 754, 761 (Ind. Ct. App. 2020) (quoting *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1056 (Ind. 2001)). "This is especially true where the language in question purports to exclude coverage." *Id*. (citation omitted). "Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable." *Id*. (citation omitted). "The exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into

play." *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012 (citations and quotation omitted). "Proper interpretation of an insurance policy, even if it is ambiguous, generally presents a question of law that is appropriate for summary judgment." *American Home Assur. Co. v. Allen*, 814 N.E.2d 662, 666 (Ind. Ct. App. 2004) (citing *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997)).

The parties brief and argue several issues in this appeal. We begin with whether USAG's claims predate the policy period and therefore are not covered, and whether the policy's wrongful conduct exclusion bars the Nassar-related claims. We continue with the policy's bodily injury exclusion, and whether insurance coverage exists for government investigations and related matters. Then, we consider the parties' argument concerning a $250,000 "Third Party EPL" sublimit in the policy.

## II.  Notice–When Claims Made

Liberty argues first that coverage under the claims-made D&O policy is excluded because the initial Nassar-related claims were made before the policy period of May 16, 2016 through May 16, 2017. On this question, the bankruptcy court agreed with USAG and concluded that Liberty had failed to designate evidence that any claims involving Nassar's sexual abuse were made before the policy period began.

The relevant policy provision states:

> **Claim** means:
>
> …

> (c) the commencement of a formal criminal, administrative or regulatory proceeding or formal investigation against an Insured, …
>
> …
>
> A **Claim** will be deemed first made on the date an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation.

Liberty submits the first claim was made no later than 2015, when the FBI interviewed two athletes in response to a request by USAG. Those interviews constitute a formal investigation, Liberty contends, regardless of whether the FBI deemed them part of only a "preliminary investigation." Liberty also asserts that even though Indiana law does not explain the meaning of a "formal investigation," we should find guidance in Indiana case law giving "suit" a "broad interpretation." To Liberty, given the FBI interviews, a Nassar-related claim was first made before the policy period. Because that claim arose from the same interrelated wrongful acts, none of the Nassar-related claims are covered.

As for any evidentiary deficiencies from which its position might suffer, Liberty criticizes the bankruptcy court for not giving it the chance to sufficiently develop the record through discovery. Liberty submits it did not file an affidavit under Federal Rule of Civil Procedure 56(d)—which provides that a litigant can show "that, for specified reasons, it cannot present facts essential to justify its opposition"—because there had never been a Federal Rule of Civil Procedure 26 conference. The insurer also faults the district court for not allowing it to conduct discovery or to present new evidence as part of its

objections to the bankruptcy court's proposed findings. To Liberty, Bankruptcy Rule 9033(d) required that the district court consider new evidence in ruling on the parties' motions.

USAG responds that the FBI did not conduct a "formal investigation" because it interviewed only a single witness twice during what it calls a "preliminary investigation." The policy's definition of claim requires USAG receive notice of a formal investigation during the policy period. Liberty's only evidence that an athlete allegedly complained about Nassar in the 1990s, USAG contends, consists of allegations made on "information and belief" in some of the athlete lawsuits. As for other complaints that an investigative report suggested were made in the 1990s, USAG notes that they were made to gym owners and coaches, not to USAG, and thus do not qualify as claims under the policy. By Liberty missing its chance to file a Rule 56(d) affidavit in the bankruptcy court, USAG asserts, Liberty waived all arguments that more discovery was needed. USAG also contests Liberty's interpretation of Bankruptcy Rule 9033(d).

We agree with USAG that the FBI's actions before the policy period did not amount to a claim under the policy. The policy deems a claim made only once "an **Insured** receives a written demand, complaint, indictment, notice of charges, or order of formal investigation." The FBI's interview of one athlete twice, at USAG's request, is not any of those things. Liberty asks us to look to the definition of "suit" under Indiana caselaw, but at issue here is whether there was a claim consisting of a formal investigation. The policy's provisions regarding those terms are expressly defined and do not encompass FBI interviews.

As for the complaints made in the 1990s, no evidence suggests they were claims. That several athlete lawsuits allege the existence of such complaints on "information and belief" does not help Liberty. Under Rule 56(c)(2), a party may object, as USAG has, that evidence presented by the other party cannot be presented in admissible form. Statements made on "information and belief" are not admissible for their truth, 10B WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE CIVIL § 2738 (4th ed. 2021), and they do not satisfy the personal-knowledge requirement for affidavits. *Weiss v. Cooley*, 230 F.3d 1027, 1034 (7th Cir. 2000). The policy deems a claim made upon notice to an insured, and the other complaints were made to member gyms and coaches, not to USAG or any other insured. Liberty has not shown a genuine issue of material fact on this point.

Liberty complains it could have made that showing if only the bankruptcy and district courts had allowed it to engage in discovery. The insurer insists it was denied relief under Rule 56(d), and it argues that the district court incorrectly decided not to hear additional evidence in its review of the bankruptcy court's recommendations. These decisions are reviewed for an abuse of discretion. *Smith v. OSF HealthCare Sys.*, 933 F.3d 859, 861 (7th Cir. 2019).

Liberty missed its chance to seek discovery in bankruptcy court when it failed to file a Rule 56(d) affidavit explaining how the lack of discovery had prevented it from meeting its burden on summary judgment. That failure "alone justifies affirmance" when a party argues on appeal that it had insufficient opportunity for discovery below. *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2000). This remains true even when a party argued below, like Liberty did, that it

needed discovery. *Id.; Kallal v. CIBA Vision Corp.*, 779 F.3d 443, 446 (7th Cir. 2015).

On this point, Liberty offers two arguments. First, it contends Rule 26(d) barred it from filing a Rule 56(d) affidavit. Rule 26(d) provides "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except … or when authorized by these rules, by stipulation, or by court order." Indeed, no Rule 26(f) conference had taken place when the bankruptcy court issued its proposed findings and conclusions. But while a court has the authority to oversee the discovery conference, the responsibility for organizing such a conference lies with the parties. *See* Rule 26(f)(2) ("The attorneys of record … are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan.") So, Liberty bears at least some responsibility for a Rule 26(f) conference not occurring.

Moreover, Rule 26(d) is not related to whether a party can ask the court for the need or the right to conduct discovery under Rule 56(d). A Rule 56(d) filing does not require that a party ask the court for the right to conduct discovery. Such a filing need only explain that the lack of discovery was the reason for the party's inability to carry its burden at summary judgment. If the court is satisfied with that explanation, Rule 56(d) enumerates the ways the court can grant relief.

Second, Liberty claims Bankruptcy Rule 9033(d) compelled the district court to consider new evidence, and that the district court erred by refusing to grant the Rule 56(d) motion that Liberty filed along with its objections to the

bankruptcy court's proposed findings. Rule 9033(d) provides that in reviewing a bankruptcy court's proposed findings:

> The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusion of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence or recommit the matter to the bankruptcy judge with instructions.

Liberty interprets Rule 9033(d) to mean that the bankruptcy court must review the whole record, or after receiving more evidence, of any portion of the bankruptcy court's findings to which specific objections were filed. Because Liberty filed specific objections, it says the district court was required to accept new evidence.

The 1987 Advisory Committee Notes on Rule 9033 inform its interpretation. The rule was "modeled on Rule 72 F. R. Civ. P.," which governs a district judge's review of a magistrate judge's recommendations on pretrial motions. The Committee Notes state that Rule 9033(d) "adopts the de novo review provisions of Rule 72(b)." Rule 72(b)(3) provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return

>the matter to the magistrate judge with instruc-
tions.

This court has not addressed the question of when a district judge's review under Rule 72(b) of a magistrate judge's ruling should include new evidence. Other circuits have ruled on this issue that the district court has discretion whether to consider additional evidence not presented to the magistrate judge. *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (examining the statutory provision that Rule 72(b) implements—28 U.S.C. § 636(b)(1)(C)—and holding that "a district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation."); *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 70 (3d Cir. 2000) (ruling that "the [District] Court has discretion whether to consider additional evidence not presented to the Magistrate Judge"), *overruled on other grounds by Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467–68 (3d Cir. 2011); *Freeman v. Cnty. of Bexar*, 142 F.3d 848, 852 (5th Cir. 1998) (observing that the "best description" of the district court's discretion in this circumstance is that "it should be at least as broad as that conferred on the district court to determine motions for reconsideration of its own rulings.").

On the closely related question of whether new arguments, rather than new evidence, can be made to a district judge reviewing a magistrate judge under Rule 72(b), nearly all the circuits have held either that those new arguments may not be made, or that the district court has discretion as to whether to allow them. *See Williams v. McNeil*, 557 F.3d 1287, 1291–92 (11th Cir. 2009) (noting and adopting the positions taken by the First, Fifth, Ninth, and Tenth Circuits). Only the

Fourth Circuit has held that new arguments must always be allowed. *United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992); *see also Samples v. Ballard*, 860 F.3d 266, 273 n.7 (4th Cir. 2017) ("Our approach in *George* is a minority position, and one that has been criticized and rejected by our sister circuits.").

So, the overwhelming interpretation of Rule 72(b) is that the district court's discretion is paramount when reviewing a magistrate judge's proposal on whether to allow a party to make new arguments or to introduce new evidence. This meaning of Rule 72(b) informs our interpretation of Rule 9033(d). Two rules, both promulgated by the Supreme Court under the authority of the Rules Enabling Act, 28 U.S.C. § 2072 (as amended), using virtually identical language, and governing very analogous situations, should be interpreted in light of each other. The related-statutes canon—that related legislative enactments are *in pari materia*, and so should be interpreted harmoniously—confirms that notion. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252 (2012). *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context"). Rule 9033(d) and Rule 72(b) use essentially the same words and phrases to communicate the standard of review and the district court's discretion to consider new evidence. This strongly suggests those words and phrases should be interpreted the same way.

Another reason to doubt Liberty's position is the harmonious-reading canon—"[t]he provisions of a text should be interpreted in a way that renders them compatible." SCALIA & GARNER, *supra*, at 180. Liberty's interpretation of the first

sentence of Rule 9033(d), as requiring a district judge to accept new evidence when presented with specific objections, stands in contradiction to the permissive language of the next sentence, which says that the "district judge *may* … receive further evidence." (emphasis added).

Whether a Rule 56(d) affidavit is evidence or an argument—it can have aspects of both—the result is the same: Liberty had no good reason for not filing such an affidavit with the bankruptcy court. Liberty's position that it can present such evidence for the first-time during review of the bankruptcy court's position would unduly limit the bankruptcy court's role. We disagree with Liberty's interpretation of Rule 9033 and conclude that the district court did not abuse its discretion by denying Liberty's request.

In summary, the policy deems a claim made once there has been notice to an insured. Liberty has not shown a genuine issue of material fact that USAG had notice before the policy period commenced. Further, the district court did not abuse its discretion when it decided not to hear additional evidence in its review of the bankruptcy court's recommendations. So USAG is correct that none of the activities before the policy period amounted to a claim made under the policy.

Next to consider are the parties' arguments on the policy's wrongful conduct exclusion and whether it precludes insurance coverage for the Nassar-related claims.

### III. Wrongful Conduct Exclusion

The policy precludes coverage for claims in any way related to certain wrongful conduct by any insured. Liberty argues this exclusion bars coverage for all the Nassar-related

claims at issue in this appeal. USAG argues the exclusion applies to none of the claims or to only a small portion of them.

The wrongful conduct exclusion reads:

> **4. Claim Exclusions**: This Policy does not apply to any **Claim** made against any **Insured**:
>
> …
>
> **4.9** based upon, arising from, or in any way related to:
>
> …
>
> (b) any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured**;
>
> provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred.

Also included is what the parties call an anti-imputation clause, or carve-back, as amended by an endorsement. That provides: "For purposes of determining the applicability of Sections 4.1 through 4.9, the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**."

The bankruptcy court sided with USAG and concluded that the wrongful conduct exclusion does not apply to most of the Nassar-related claims. The exclusion is ambiguous, that court found, and in at least one reasonable interpretation the exclusion's two mentions of "any **Insured**" must refer to the same party. Under this reading, Nassar's illegal actions could affect coverage only for Nassar himself, not for USAG. The court also determined that even if the two instances of "any **Insured**" could refer to different people, the requirement that

the exclusion apply only to conduct that has in fact been finally adjudicated limited the exclusion to those claims concerning the ten instances of abuse for which Nassar was criminally convicted, not those concerning hundreds of other victims. Finally, again in the alternative, the court concluded that the anti-imputation clause prevented the wrongful conduct exclusion from applying. Even though that clause only bars the imputation of the wrongful acts of one "**Insured Person**" to another "**Insured Person**," the bankruptcy court concluded that the anti-imputation clause did not explicitly say that the wrongful conduct of other insureds should be imputed to the "**Insured Organization**," USAG.

On appeal, Liberty renews its argument that the wrongful conduct exclusion bars all the Nassar-related claims. To Liberty, Nassar, an "**Insured Person**," committed a willful violation of law, and the bankruptcy court injected ambiguity where no reasonable person would find it. Even more, Nassar has pleaded guilty, so his wrongful conduct has been finally adjudicated in fact. Liberty maintains that all the Nassar-related claims qualify are "in any way related to" the ten instances of abuse for which he was criminally convicted. Liberty also argues USAG is not an "**Insured Person**" which the policy defines as only natural persons. In response, USAG reiterates the bankruptcy court's reasoning: "any **Insured**" is ambiguous, only ten acts of sexual abuse were finally adjudicated as criminal convictions in Michigan state court, and the anti-imputation clause precludes applying the wrongful conduct exclusion to the Nassar-related claims.[4]

---

[4] USAG also contends Liberty should be estopped by its pre-litigation communications in which Liberty interpreted the policy differently. But in those communications Liberty reserved its rights, remedies, and

Section (A) below provides insurance law background on a wrongful conduct exclusion in a claims-made D&O policy. Then, four phrases in the wrongful conduct exclusion are evaluated—(B) "any **Insured**"; (C) "**finally adjudicated … conduct in fact occurred**"; (D) **"based upon, arising from, or in any way related to"**; and (E) the anti-imputation or carve-back clause.

## A. Application in a directors' and officers' policy

D&O policies commonly exclude insurance coverage for claims brought about or contributed to by fraudulent, dishonest, or criminal conduct. *See generally* S. Splitt, *et al.*, 7A Couch on Insurance § 103.40; 9A COUCH ON INSURANCE, § 131:35; G. Lockwood, LAW OF CORPORATE OFFICERS & DIRECTORS: INDEMNIFICATION AND INSURANCE § 4.19. Some state laws mandate such an exclusion. *See, e.g.*, N.Y. BUS. CORP. LAW § 726(b)(1) (2011).

Many wrongful conduct exclusions in D&O policies include a "final adjudication" requirement. L. Spector, "Insurance Coverage for Business Tort Claims Alleging Intentional Wrongdoing," 51 TORT TRIAL & INS. PRAC. L.J. 91, 95 (2015). For the exclusion to apply, the wrongful conduct must have been determined to have occurred by court judgment or other final adjudication in a separate action in which the conduct was at issue. *See Nat'l Union Fire Ins. Co. v. Continental Ill. Corp.*, 666 F. Supp. 1180, 1186, 1191 (N.D. Ill. 1987); *cf.* 14 COUCH ON INSURANCE, § 201:59. This requirement is strictly construed. If an underlying claim is settled, rather than adjudicated, then the exclusion does not apply. *See Pendergest-Holt*

defenses under the policy and applicable law, as well as disclaiming their waiver.

*v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 572–73 (5th Cir. 2010). The wrongful conduct exclusions in D&O policies differ fundamentally from those in comprehensive general liability (CGL) policies. The exclusions in a D&O policy require the insurer to show significantly more than might suffice as an intentional act under a CGL policy. Spector, 51 TORT TRIAL & INS. PRAC. L.J. at 95. In some policies, the "final adjudication" requirement includes an "in fact" condition—the fraud or dishonesty must have actually occurred. D. Bordon & E. Van Vechten, 4 LAW AND PRAC. OF INS. COVERAGE LITIG. § 47:32 (2021).

Claims in which the intentional wrongdoing rises to the level of "criminal or deliberate fraud," Spector, 51 TORT TRIAL & INS. PRAC. L.J. at 95, are typically not covered due to the wrongful conduct exclusion in a D&O policy. The line between intentional and predictably harmful conduct which may fall within an intentional-acts exclusion, and reckless conduct which may fall outside of it, can sometimes be difficult to draw. *See California Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 116 (Cal. Ct. App. 2002) (considering whether drunk driving is willful or reckless behavior for purposes of a statutory intentional-acts exclusion).

The wrongful conduct exclusion here includes each of these requirements common to a wrongful conduct exclusion in a claims-made D&O policy. Coverage is excluded for "any **Claim** made as to any **Insured**" "based upon, arising from, or in any way related to" "any deliberately dishonest, malicious or fraudulent act or omission or any willful violation of law by any **Insured**" "provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact

occurred." We located no authority applying Indiana law to a D&O policy with this type of wrongful conduct exclusion.[5]

Our interpretation of this wrongful conduct exclusion is informed by the fortuity principle, which underlies all insurance. That principle addresses those situations where a loss is not accidental, as it is against public policy to allow an insured to collect insurance proceeds for a known or expected loss. *Cf. 5200 Keystone Ltd. Realty, LLC v. Netherlands Ins. Comp.*, 29 N.E.3d 156, 161 (Ind. Ct. App. 2015) (explaining the "known loss" doctrine). It would be a moral hazard to insure against liability arising from intentional and inherently harmful conduct, such as criminal conduct. *See Rimert v. Mortell*, 680 N.E.2d 867, 873 (Ind. Ct. App. 1997).

With this background, we evaluate the various contested phrases in the wrongful conduct exclusion.

### B.  "any Insured"

To paraphrase, the policy does not apply to any claim against "any **Insured**" in any way related to wrongful conduct by "any **Insured**." The bankruptcy court determined—and neither party disputes—that USAG and Nassar are each an "**Insured**" under the policy.

Liberty contends the only reasonable reading of the wrongful conduct exclusion is that the first "any **Insured**" encompasses anyone, including USAG, and that the second "any **Insured**" also encompasses anyone, including Nassar. Under this reading, the exclusion would reach all Nassar-

---

[5] This question does not reoccur under Indiana law and is specific to this factual context, so it is not a good candidate to certify to the Indiana Supreme Court pursuant to Circuit Rule 52(a).

related matters. In contrast, the bankruptcy court ruled, and USAG advances, that "any **Insured**" refers only to the same, single insured. In effect, the first "any **Insured**" would apply to "*an* **Insured**" and the second "any **Insured**" would apply to "*the* **Insured**" or "*that* **Insured**."

The parties spend much of their briefing on this issue discussing two decisions which interpret policies that include the phrase "any insured"—*Frankenmuth Mut. Ins. Co. v. Williams by Stevens*, 690 N.E.2d 675 (Ind. 1997), and *Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574 (Ind. 2013). Neither case presents a controlling interpretation of the phrase, however.

USAG likes *Frankenmuth*, in which the Indiana Supreme Court concluded that an intentional injury exclusion did not bar coverage for a claim against a wife whose alleged negligence allowed her husband to intentionally carry out a sexual molestation. 690 N.E.2d at 678. The exclusion in that case said that the policy did not cover liability "caused intentionally by or at the direction of any insured." *Id*. The Indiana Supreme Court reasoned that the exclusion applied to "liability," not "personal injury," and that the liability was for the wife's negligence, not for the husband's intentional wrongdoing. *Id*. at 679. Under *Frankenmuth*, USAG submits that the wrongful conduct exclusion does not apply to any claims regarding Nassar's assaults.

Liberty asks us to focus on *Holiday Hospitality*. There, a minor guest was molested by a hotel employee who entered the guest's locked room at night. 983 N.E.2d at 576. The minor's mother sued the hotel franchisor, the franchisee, and the franchisee's owner for battery, emotional distress, and various negligent employment practices. The defendants were all

insured under the policy and turned to it for coverage. But the insurer argued the claims were not covered, due to exclusions for "bodily injury," or "personal and advertising injury" arising out of "[t]he actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of the insured," *id.*, as well as negligent employment, investigation, supervision, etc. "of a person [responsible for such conduct] for whom *any* insured is or ever was legally responsible." *Id.* at 581. In *Holiday Hospitality*, the Indiana Supreme Court ruled that the use of the word "any" conclusively barred coverage for all co-insureds. *Id*. The court's analysis would have differed, though, if instead of the exclusion applying to "any insured" it applied to "the insured." *Id*. at 581 n.10.

Despite some superficial appeal, neither decision controls. The policies in each case lack the clauses central to the meaning of this wrongful conduct exclusion. Unlike the claims-made D&O policy here, the homeowner's policy in *Frankenmuth* is an occurrence policy, which did not bar coverage of "any **Claim**" against "any **Insured**" "in any way related to" the conduct of "any **Insured**." Just so, in *Holiday Hospitality* the court analyzed an occurrence-based rather than claims-made policy, 983 N.E.2d at 576, 578, that included the phrase "any insured" as part of an express exclusion for negligent-supervision liability, a provision absent here. *Id.* at 581 & n.10.

With this gap in controlling Indiana authority, we focus on the text of the policy. The wrongful conduct exclusion's plain and ordinary meaning, *see Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012, is that the modifier "any" before the dedicated term "**Insured**" means "any"—not "an," "the," or "that." The

bankruptcy court's interpretation erases the second occurrence of "any" in the exclusion, which is contrary to that provision's plain meaning. Each instance of "any **Insured**" can refer to a different insured. If the two occurrences were supposed to always refer to the same person, the second instance would have said "that Insured," or "that same Insured," or another such construction which would carry that meaning. But the wrongful conduct exclusion does not say that.

Substituting "Nassar" and "USAG" for the term "**Insured**" shows how the term "any **Insured**" should be read here. Nassar is "any **Insured**," so the exclusion applies based on his wrongful conduct. USAG is also "any **Insured**," so the exclusion precludes coverage for "any **Claim**" against USAG (subject, of course, to the remainder of the requirements of the wrongful conduct exclusion). USAG is not correct that if the second "any **Insured**" refers to Nassar, that the first "any **Insured**" is necessarily limited to Nassar. "Any" is defined as "one, some, or all indiscriminately of whatever quantity."[6] "Any" cannot be defined as the bankruptcy court did, so the exclusion bars coverage only for the offending person. USAG's interpretation essentially asks us to rewrite the exclusion, which would not be proper. *Keckler v. Meridian Sec. Ins. Co.*, 967 N.E.2d 18, 28 (Ind. App. 2012) ("[w]e may not rewrite an insurance contract") (quoting *Bowen v. Monroe Guar. Ins. Co.*, 758 N.E.2d 976, 980 (Ind. App. 2001)).

The double use of "any **Insured**"—negotiated by sophisticated parties—is broad language that does not present

---

[6]    "Any."    *Merriam-Webster.com    Dictionary*,    Merriam-Webster, https://www.merriam-webster.com/dictionary/any.   Accessed   Feb.   25, 2022.

ambiguity. "Any," to a reasonable person, does not mean "the" and is not limited to a particular insured's conduct. *See, e.g., Bonin v. Westport Ins. Co.*, 930 So. 2d 906, 915 (Sup. Ct. La. 2006) (holding that insured against whom claim was made need not be the same insured who committed the wrongful act as long as the claim was based upon, arose out of, or indirectly resulted from "an" insured's wrongful act and such insured had been so adjudged). Language excluding coverage must be clearly expressed to be enforceable. *Nat'l Collegiate Athletic Ass'n. v. Ace American Ins. Co.*, 151 N.E.3d at 761; *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012. This interpretation meets that requirement. "Any **Insured**" is broad, yet clear in its meaning, so it does not admit of ambiguity. It would muddy the language to read "any" to mean something other than "without restriction." In the absence of ambiguity, this portion of the wrongful conduct exclusion is not construed against Liberty.

For these reasons, Liberty correctly reads the "any **Insured**" language of the wrongful conduct exclusion. The bankruptcy court's recommendation incorrectly found ambiguity in this portion of the policy.

### C. "finally adjudicated … conduct in fact occurred"

The wrongful conduct exclusion "shall only apply if it is finally adjudicated that such conduct in fact occurred."

To the bankruptcy court, "USAG's interpretation of the 'final adjudication' requirement is reasonable and an ordinary policy holder of average intelligence would conclude that the exclusion only bars coverage for indemnity for costs arising from a finally adjudicated intentional wrongful act." "Nassar's conduct has only been adjudicated as to the ten crimes

on which a guilty verdict was entered," according to that court, not those concerning hundreds of other victims. USAG agrees with this ruling, but Liberty pushes back, contending that all of Nassar's sexual abuse which underlies the Nassar-related claims was finally adjudicated in Michigan's courts.

The resolution of Nassar's state criminal cases informs whether, and how much of, his wrongful conduct has been "finally adjudicated" for purposes of the wrongful conduct exclusion. His prosecution culminated in Nassar and Michigan entering into two written plea agreements, one in Eaton County and one in Ingham County. Nassar signed the agreements and during his guilty plea colloquies under oath he orally admitted their terms.

Nassar pleaded guilty to and was sentenced on ten counts of first degree criminal sexual conduct in violation of Michigan Combined Law 750.520b, three in Eaton County and seven in Ingham County. Twenty-nine other counts—10 in Eaton County and 19 in Ingham County—were dismissed, a majority of those when Nassar pleaded guilty (with some dismissed earlier at a preliminary hearing). Per the dockets in these cases, the counts dismissed at the guilty plea hearings were *nolle prosequi*—"will no longer prosecute"—a prosecutor's formal notice of abandonment of those charges. In Michigan, a *nolle prosequi* is a dismissal without prejudice, which does not preclude initiation of a later prosecution. But the entry of the order of *nolle prosequi* may be the final act of a binding agreement in a case on which a defendant may rely. 1A GILLESPIE MICH. CRIM. L. & PROC. § 16:52 (2d ed. April 2021).

The plea agreements between Michigan and Nassar include several provisions relevant to the "final adjudication" requirement. Nassar also admitted to these provisions during

his guilty plea colloquies. First, Nassar waived any and all defenses to the conduct for which he pleaded guilty (including that his crimes were "for a legitimate medical purpose"). Second, the plea agreements included a non-prosecution agreement "for all reported Criminal Sexual Conduct charges reported to the [MSU] Police Department as of November 22, 2017." Attached to each plea agreement was a list of 115 cases not to be prosecuted. Third, during the plea colloquies, and in compliance with Michigan's Crime Victim's Rights Act, the prosecutor confirmed that the terms of the plea agreements had been discussed with all the victims, who agreed with those terms. Fourth, under the plea agreements Nassar agreed to allow all victims or their representatives to give victim impact statements at his sentencing hearings, including the 125 victims who had reported their assaults to the MSU Police Department and the other-acts victims identified on the prosecution's witness list. Most of Nassar's victims made such statements when he was sentenced, either in person, through representatives, or in writing—65 in Eaton County, and 156 in Ingham County. Nassar's plea agreements and sentencings encompassed his convicted crimes, and the Michigan Court of Appeals has affirmed Nassar's convictions and sentences.[7]

---

[7] *People v. Lawrence Nassar*, 2020 WL 7636250 (Mich. Ct. App. Dec. 22, 2020) (unpublished opinion). Nassar has applied for leave to appeal to the Michigan Supreme Court, which the Michigan Attorney General has opposed, and the Michigan Supreme Court has yet to decide. Michigan Supreme Court Case No. 162615.

The argument that final adjudication occurs only upon exhaustion of appellate remedies has generally been rejected. *See, e.g.*, *Unencumbered Assets Tr. v. Great Am. Ins. Co.*, 817 F. Supp. 2d 1014, 1033 (S.D. Ohio 2011) (rejecting argument that exhaustion of appellate review was required to trigger

So, Nassar's wrongful acts were:

- charged and he pleaded guilty to ten counts, for which he was sentenced;
- charged and dismissed (mostly *nolle prosequi*) pursuant to the plea agreements; or
- not charged but included in the non-prosecution agreements with the list of cases attached.

Given these specifics of how Nassar's state criminal sexual abuse cases were resolved, the wrongful conduct that was finally adjudicated encompassed the ten counts on which he pleaded guilty. But the Michigan state courts adjudicated Nassar as formally guilty—beyond a reasonable doubt—of only ten of his scores of charged and uncharged acts of sexual abuse. The remaining wrongful conduct was dismissed without prejudice or is subject to a non-prosecution agreement but not adjudicated. So, a portion, but not all, of Nassar's wrongful conduct satisfies this "finally adjudicated … conduct in fact occurred" clause in the wrongful conduct exclusion.

### D. "based upon, arising from, or in any way related to"

The wrongful conduct exclusion begins by prohibiting coverage for a "claim" that is "based upon, arising from, or in any way related to" wrongful conduct, provided that conduct is finally adjudicated to have in fact occurred. The phrase "based upon, arising from, or in any way related to" is not defined in the policy. We consider its plain meaning, whether it is ambiguous, and how courts have interpreted it and similar phrases.

---

dishonesty exclusion and holding that judgment of conviction for fraudulent conduct was sufficient to preclude coverage under that exclusion).

### 1. Plain Meaning

Under Indiana law, "if a contract is clear and unambiguous, the language therein must be given its plain meaning." *Beam*, 765 N.E.2d at 528; *see also Abstract & Title Guar. Co. v. Chicago Ins. Co.*, 489 F.3d 808, 811–12 (7th Cir. 2007). The plain meaning of "based upon, arising from, or in any way related to" includes nearly any type of connection between the claim and the insured's wrongful acts. That includes a wide array of logical connections. *See Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989) (interpreting Indiana law and concluding that "related" covers "a very broad range of connections, both causal and logical"); *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 391 (7th Cir. 2008) (same).

Indiana law also provides that "the text of a disputed provision may be understood by reference to other provisions within the four corners of the document." *Claire's Boutiques, Inc. v. Brownsburg Station Partners LLC*, 997 N.E.2d 1093, 1098 (Ind. Ct. App. 2013) (citing *City of Portage v. S. Haven Sewer Works, Inc.*, 880 N.E.2d 706, 711 (Ind. Ct. App. 2008)). In the policy here, the phrase "based upon, arising from, or in any way related to" is used five times when delineating the policy's claim exclusions and another four times in an endorsement to the policy that adds further exclusions. In each of these nine instances, the phrase introduces the exclusion and broadens the circumstances that fall within it.

At each reference, its use includes most logical connections. For example, § 4.5 of the policy excludes coverage for any claim "based upon, arising from, or in any way related to" "any demand, suit, or other proceeding against any **Insured** which has been made, which existed, or was pending prior to the applicable Prior Litigation Date" or "the same or

substantially the same facts, circumstances or allegations in-
volved in such demand, suit, or other proceeding." As used
in this exclusion, "in any way related to" must include a logi-
cal connection. Section 4.5 cannot exclude coverage only for
claims, for example, "caused by" prior litigation. If it did, it
would not exclude coverage on claims for a later lawsuit with
nearly identical allegations as those made in a prior lawsuit
(unless it could be shown that the later lawsuit was caused by
the prior litigation, which would be highly unlikely). Such an
interpretation would defeat the purpose of a "prior litigation"
exclusion as those exclusions have been uniformly inter-
preted.[8]

---

[8] *See, e.g., Fed. Ins. Co. v. Raytheon Co.*, 426 F.3d 491, 499–500 (1st Cir. 2005)
(rejecting a narrow reading of a prior litigation exclusion and noting that
the purpose of such exclusions is to "combat the problem of adverse se-
lection"); *Johnston v. Exec. Risk Indem., Inc.*, No. 1:05-CV-2826-CAP, 2007
WL 9701322, at *6 (N.D. Ga. Oct. 1, 2007) (stating that a narrow reading
"wholly defeats the focus of the prior/pending litigation exclusion, that is,
to exclude coverage for lawsuits based on common facts or circumstances
present in prior or pending litigation"); *Pereira v. Nat'l Union Fire Ins. Co.
of Pittsburgh, Pa.*, No. 04 CIV. 1134 (LTS), 2006 WL 1982789, at *4 (S.D.N.Y.
July 12, 2006) ("In determining whether a prior litigation clause excludes
coverage, courts have focused on whether there was a sufficient factual
nexus between the two lawsuits … The coverage does not depend upon
the pleader's art but rather upon underlying facts."); *Zunenshine v. Exec.
Risk Indem., Inc.*, No. 97 CIV. 5525 (MBM), 1998 WL 483475, at *1, 5
(S.D.N.Y. Aug. 17, 1998), *aff'd*, 182 F.3d 902 (2d Cir. 1999) (noting that "the
purpose behind" claims-made insurance policies and prior litigation ex-
clusions is "to limit [the insurer's] liability to a fixed period of time," and
stating that to "permit an insured to recover for claims" that were "based
upon, arising out of, directly or indirectly resulting from, in consequence
of, or in any way involving" the same facts or circumstances alleged in a
pending lawsuit "would be to grant the insured more coverage than he
bargained for and paid for, and to require the insurer to provide coverage

The same is true for one of the exclusions in the endorsement, which precludes coverage for any claim "based upon, arising from, or in any way related to an **Insured** serving as a fiduciary of any plan, fund or program which is not an **Insured Plan**, even if such service is at the direction or request of an **Insured Organization**." The only reasonable interpretation of "in any way related" in this exclusion includes a logical connection. If the exclusion applied only to claims "caused by" an insured's service as a fiduciary, it would not necessarily cover claims where a litigant alleged the insured breached his duty while serving a fiduciary. The insured could then argue there is ambiguity in the exclusion because the claim was caused by the insured's alleged actions while serving as a fiduciary, not by the service as a fiduciary itself. Such an interpretation would functionally render this exclusion a nullity, yet it would follow from adopting an artificially narrow construction of "in any way related to" as "caused by."

Read in the context of the entire insurance policy, the plain meaning of "based upon, arising from, or in any way related to" includes a logical connection between the claim and the insured's wrongful acts.

### 2. Causal Connection

USAG implies that "in any way related to" should be interpreted more narrowly, as requiring a causal rather than logical connection between the claim and the insured's wrongful acts. This would limit the scope of the wrongful conduct exclusion. Even if that interpretation did not

---

for risks not assumed") (quoting *United States v. A.C. Strip*, 868 F.2d 181, 187 (6th Cir. 1989)).

always prevail, if the phrase is ambiguous, it should be interpreted in favor of USAG, the insured.

Yet, there is no indication here that a causal connection is required for a claim to be "in any way related to" wrongful conduct. If the parties had meant to limit the wrongful conduct exclusion to claims caused by an insured's wrongful acts, they would have used the terms "caused by" or "causal." The parties knew how to use those terms where they intended that meaning. The policy, at § 23.13, defines "**Interrelated Wrongful Acts**," as those "that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions, or causes."[9] That same definition also uses the phrase "common nexus," which generally includes a causal link. *See Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 222 (2012) (endorsing a lower court's "substantial-nexus" test that requires a "significant causal link" between two events); Black's Law Dictionary (11th ed. 2019) (defining "nexus" as "[a] connection or link, often a causal one").

The wrongful conduct exclusion does not use the phrases "caused by" or "causally connected." If the parties had intended to specify that the relationship between the wrongful conduct and the claim must be causal for coverage to be excluded, they would have done so. Nor does the wrongful conduct exclusion use the phrase "common nexus," which would have had a similar effect. "[I]n construing a contract we presume that all provisions were included for a purpose, and if possible we reconcile seemingly conflicting provisions to give

---

[9] This definition is in the context of defining a "**Claim**" rather than a "**Claim Exclusion**."

effect to all provisions." *Ryan v. Laws. Title Ins. Corp.*, 959 N.E.2d 870, 875 (Ind. Ct. App. 2011) (quoting *Magee v. Garry–Magee*, 833 N.E.2d 1083, 1092 (Ind. Ct. App. 2005)); *see also George S. May Int'l Co. v. King*, 629 N.E.2d 257, 261 (Ind. Ct. App. 1994) (same). To limit "in any way related to" to causal connections would disregard that principle of contract interpretation. That would require ignoring our observation that using different language to address parallel issues in a contract generally indicates that parties were referring to different concepts. *See Collins v. Univ. of Notre Dame Du Lac*, 929 F.3d 830, 841 (7th Cir. 2019) (citation omitted). So, "in any way related to" cannot be limited to just causal relationships in Liberty's policy.

### 3. Ambiguity

The phrase "in any way related to" is quite broad. As this court recognized in *Gregory*, the phrase is so broad that it should not be taken literally: "At some point, of course, a logical connection may be too tenuous reasonably to be called a relationship, and the rule of restrictive reading of broad language would come into play." 876 F.2d at 606. USAG has presented a good argument on the facts that such a principle applies here.

There are two primary similarities among these claims: All victims accuse the same wrongdoer, Nassar, and they all accuse him of abusing his role as a doctor to sexually assault them. But there are also several important differences between the claims. Dozens of different individual victims suffered assaults on separate occasions. Each of those assaults stands alone as a separate and independent crime. Many of the young women recount abuse that occurred dozens of times over several years. Overall, the claims stem from

thousands of assaults over decades. And each victim's experience and pain were her own. The consequences did not depend on what happened to anyone else. There is no common unit of measure (like dollars) that would allow someone to assess cumulative harm the way we would with, for instance, different shareholders' claims for accounting fraud or a corrupt self-dealing merger.

Sexual assaults are distinguishable from economic wrongdoing. Claims by shareholders or consumers may be "related" to one another when they arise from the same course of conduct, such as fraudulently concealing bad news about either a company or a product that does not work as promised. Compare, for example, how the U.S. Sentencing Guidelines aggregate economic harms suffered by multiple claimants and victims of financial crimes but treat sexual and violent assaults separately in evaluating harm from multiple counts. *See* U.S.S.G. § 3D1.2(d) (delineating two categories of crimes: those that are "grouped" and those that are not; sexual assaults—even against the same victim—are not grouped).

Consider a hypothetical variation on this case. Suppose Nassar had been convicted of sexually assaulting just one victim on just one occasion. One hundred other gymnasts then sue USA Gymnastics and its officers and directors, alleging that he sexually assaulted them too, over the past 20 years. *And suppose further that there were room to doubt the veracity of some of those additional claims.* Should the insured be denied a defense and possible indemnification on *all* those claims because Nassar had been convicted of one assault? That would be an improbable result, and one that would be unjust to the insured.

Here, we are not interpreting policy limits or deductibles, but rather a complete exclusion of coverage, where the demands for clarity are greatest. An overly broad approach to "in any way related" effectively nullifies the "final adjudication" requirement. That "final adjudication" requirement is an important and often bargained-over feature of D&O policies. If just one final adjudication (or ten) can preclude coverage for scores or even hundreds of claims asserted by separate victims alleging independent crimes over decades, that one conviction becomes the tail that wags the proverbial dog. The language of the wrongful conduct exclusion does not, in our view, compel this result.

*Only* a common wrongdoer, or *only* a common victim, or *only* a common modus operandi by different wrongdoers against different victims, is not enough to establish a sufficient relationship. This case is in the grey territory where the policy's broad language becomes ambiguous as applied to these unique facts. While the insurer has a reasonable argument for excluding coverage of the other victims' claims, the insured also has a reasonable argument for not excluding them. Accordingly, under the general principles of Indiana insurance law—including that ambiguous policy language is construed against the insurer, especially when it comes to policy exclusions—the insured, USAG, prevails on this point.

### 4. *Case Law*

Case law is sparse on this problem of relatedness for purpose of the wrongful conduct exclusions in D&O policies. What case law exists does not help determine when "related to" is "related enough." Those cases that confront this question stem from relationships that were much stronger and closer than those at issue here, making those cases more

straightforward. Those facts taken in context make us skeptical about some of the broader verbal formulations that those courts have offered.

Our dissenting colleague cites a number of these cases on this question of relatedness, but we find them all distinguishable. Those cases presented multiple claims arising from one financial transaction or cluster of connected transactions. Insurers and insureds understand, for example, that an accounting scandal or a corrupt merger is likely to generate related lawsuits by shareholders, securities purchasers, and others.

*Gregory*, 876 F.2d 602, involved claims under a legal malpractice insurance policy. The "relatedness" question concerned whether there was just one, or more than one, "occurrence" for purposes of a per-occurrence coverage cap. The defendant law firm had offered advice about the tax and securities law consequences of an abusive tax-shelter scheme involving investments in videotapes. When the scheme fell apart, investors sued for securities fraud, common-law fraud, and RICO violations. All their claims, whether based on tax advice or securities advice for the scheme, were treated as one claim. *Id.* at 604–06. The straightforward determination in *Gregory* of relatedness lends little to our analysis.

*RLI Ins. v. Conseco*, 543 F.3d 384 (7th Cir. 2008), regarding a D&O policy, presented a similar question. A round of securities-fraud litigation against Conseco was settled with release language that covered class members' claims arising out of the facts alleged in the complaint. *Id*. at 386. A few months later, a dispute about insurance coverage for that underlying settlement was resolved by another settlement. The insureds released RLI from coverage of any claim "in any way related to" the underlying actions that had been settled. *Id.* at 386–87.

Then another investor filed a new putative class action under ERISA arising from the same course of conduct. Conseco defended on the ground that the ERISA plaintiffs were all members of the earlier class and could have asserted their ERISA claims in that earlier case. The insurer said the new case was so related to the earlier case that the insureds' release of the insurer applied. *Id.* at 388–89. Not surprisingly, the district court—and this court—held that the ERISA claims were sufficiently related to the earlier case to be covered by Conseco's release of RLI. 543 F.3d at 391. While it is difficult to disagree with the result in *RLI Ins. v. Conseco*, that case offers little help in determining the outer bounds of "relatedness."

*Bay Cities Paving & Grading, Inc., v. Lawyers Mutual Ins. Co.*, 855 P.2d 1263 (Cal. 1993), which like *Gregory* concerned legal malpractice insurance, was also, by comparison, a straightforward case. The dispute involved claims that the same lawyer made two distinct errors in trying to enforce one mechanic's lien for one construction project. The single victim suffered one injury—its lien was not enforced. The claims based on two supposedly separate errors were so closely related that the "per claim" policy limit could not be doubled on the theory that there were two claims. (Nor could an insurer try to separate out such closely related claims to require the insured to pay multiple deductibles for them. 855 P.2d at 1267.)

In *Bay Cities Paving*, the Supreme Court of California made the critical point that clarity or ambiguity must be decided not in the abstract but "in the context of *this* policy and the circumstances of *this* case." *Id*. at 1271. We interpret the passage, together with the case law we have already discussed, to mean that relatedness can be readily decided in many cases— including *Bay Cities Paving* itself—but that policy language on

relatedness can still be ambiguous as applied to more com-
plex factual scenarios. That does not provide much guidance
for the very different facts here, which encompass hundreds
of different victims and separate crimes and injuries across
decades.

In *Am. Com. Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas.
Co.*, 551 N.W.2d 224 (Minn. 1996), an insurance policy covered
losses from employee dishonesty. It included a per-occur-
rence limit of $10,000, and it said that all loss "involving a []
series of related acts" would be considered one occurrence for
purposes of that limit. One employee embezzled $190,000 in
155 individual transactions by using two distinct methods:
taking customers' cash payments for herself and issuing un-
authorized checks to herself. The Minnesota court rejected the
insured's argument that there were 155 occurrences. The
court held that there were two, but only two, occurrences for
purposes of the limit. The phrase "series of related acts" sig-
naled an intent to encompass a continuous embezzlement
scheme with the same method on a continuous basis. *Id.* at
228. In that case, however, there was only one victim and one
location where the acts occurred. Moreover, the different
transactions inflicted a cumulative financial harm on the em-
ployer, making the situation there very different from the
facts presented here.

The dissent states it is not dispositive that Nassar's acts
targeted different victims. It cites decisions in which courts
have decided that the fact that an insured's acts impact differ-
ent victims does not create an ambiguity as to whether those
acts are logically connected.

The best case the dissent cites for this point is *Kilcher v.
Continental Casualty Co.*, 747 F.3d 983 (8th Cir. 2014), in which

the question was whether a financial advisor's bad advice to four siblings amounted to one occurrence subject to a $1 million per occurrence limit or separate occurrences subject to a $2 million aggregate limit. *Id.* at 987. The siblings were members of a Native American tribe who received annual distributions from the tribe's gaming operations. *Id.* at 984. The advisor allegedly steered all four young adults into high-commission whole-life insurance policies that were unsuitable for their financial circumstances. *Id.* at 986. The professional-liability insurance policy said that claims involving "interrelated wrongful acts" would be considered just one claim, and it defined interrelated wrongful acts broadly as "any wrongful acts which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, or event." *Id.* at 987. The district court had held that treating the siblings' individual claims as "interrelated" "pushes the Policy's language to unreasonable extremes." *Id.* at 987–88. The Eighth Circuit reversed, extending *Am. Com. Ins. Brokers* to the four siblings taken advantage of in similar ways. *Id.* at 989–90.

*Kilcher* is distinguishable from this case based on its much smaller numbers of (related) victims and the economic nature of the harm that was perpetrated, as well as the fact that it was not excluding coverage entirely but deciding only how to apply coverage limits. Even if we were to conclude that *Kilcher* was correctly decided and instructive, it is a narrow ground on which to say the policy language here is unambiguous as applied to such different victims.

On this issue of a single versus multiple victims, the dissent also cites *Continental Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000), where a legal malpractice insurer had already paid its liability policy limits in one lawsuit arising out of its

insured lawyers' role in promoting a shady investment scheme. When a second lawsuit was brought by another investor complaining about the lawyers' role in promoting the same investment scheme, the insurer denied coverage because the second suit alleged "related wrongful acts." *Id.* at 1260–61. The district court ruled in favor of the insurer, and the Eleventh Circuit affirmed by adopting the district court's opinion, finding there was just one course of conduct in promoting the shady investments to many investors. *Id.* at 1262–63. Although *Wendt* is similar to *Gregory*, a lawyer's common course of conduct promoting a particular investment vehicle is far different from Nassar's repeated sexual assaults against hundreds of victims over more than twenty years.

Our dissenting colleague also cites *HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309 (11th Cir. 2008), which involved the HealthSouth accounting fraud and self-dealing scheme and a "prior litigation" exclusion in a D&O policy. The first lawsuit was a *qui tam* action filed in 1997. The insured then bought a "claims made" D&O policy that covered the period from 2000 to 2004. When a shareholder derivative action was filed in 2002 alleging the same accounting fraud, the insurer denied coverage because the new action was "in any way related to" the prior litigation. *Id.* at 1311–12. The Eleventh Circuit adopted a broad interpretation of the phrase and found that the exclusion applied despite the insureds' arguments that the allegations in the two cases were not specific enough to show they arose from the same events. *Id.* at 1315–16. Although those different suits by different plaintiffs stemming from the same scheme seem related, the self-dealing and accounting fraud at issue in *HR Acquisition I Corp.* is substantially different from Nassar's conduct.

The relationships between the factual circumstances in the cases the dissent cites are much more straightforward than those that connect Nassar's wrongful acts. Those cases presented multiple claims arising from one financial transaction or a cluster of connected transactions. Insurers and insureds understand, for example, that an accounting scandal or a corrupt merger is likely to generate related lawsuits by shareholders, securities purchasers, and others. Multiple sexual assaults are a different category entirely, especially on this scale and over so many years. A relative handful of cases applying such a vague standard to quite different financial wrongs does not persuade us that the insured's view here is unreasonable. "In any way related" is too ambiguous—as applied to these very different facts—to exclude coverage of the non-guilty-plea claims.

### 5. *Larger Implications*

The incentives for participants in the market for insurance may differ depending on whether the liability policy at issue is "occurrence-based" or "claims-made." For the insurer, an occurrence-based policy can have a long "tail" of potential liability. The insurance industry's answer to that long risk is to offer a claims-made policy covering claims asserted within a specified time period. *See Nat'l Union Fire Ins. Co. v. Baker & McKenzie*, 997 F.2d 305, 306 (7th Cir. 1993).

An insurer writing such a claims-made policy must exclude coverage for both pending claims and looming claims that the insured may know about, but which have not yet been asserted formally. Those policies are written to exclude both the pending and looming claims, but also new claims related to the pending and looming claims. But if an entirely new claim is asserted and coverage is provided, under a

claims-made policy, those later "related" claims will come within the policy coverage. In *Continental Cas. Co. v. Cuda*, 715 N.E.2d 663, 665 (Ill. App. 1999), for example, the policy said: "*Any claim or claims arising out of the same or related wrongful acts*, shall be considered first made during the policy term in which the earliest claim arising out of such wrongful acts was made." *Id*. (emphasis supplied). Using a broad concept of "related," the claims-made insurer will be exposed again to a long "tail" of potential liability and the corresponding duty to defend, which will require it to incur significant costs.

In this case, the insurer wants a broad interpretation and the insured desires a narrow one. In other contexts, though, the incentives will be flipped, including to preserve for insurers the core advantage of claims-made liability policies. By interpreting "related" too broadly in the conduct policy exclusion here, we could inadvertently affect the economics of the claims-made insurance market by broadening the scope of coverage of these policies. These concerns about the implications of interpreting "related to" too broadly are substantial, and they factor into our analysis. We must bear in mind that this is a unique case. A holding that "related to" is unambiguous, even as applied in these unusual circumstances, could have unforeseen consequences for claims-made D&O coverage.

### E.  Anti-Imputation or Carve-Back Clause

The wrongful conduct exclusion's final clause (which was amended by an endorsement) states that for purposes of determining its applicability, the wrongful act "of any **Insured Person** shall not be imputed to any other **Insured Person**." The parties label this the anti-imputation, or carve-back, clause. Such a provision is typical in D&O policies and

preserves the severability of this exclusion. DIRECTOR & OF-FICER LIABILITY: INDEMNIFICATION AND INSURANCE, § 12.15.

Liberty contends the carve-back removes any imputation only as to an "**Insured Person**," not an "**Insured Organization**" like USAG, so the bankruptcy court's recommendation was in error. USAG responds that such an argument should not bar coverage, as any exclusion must be interpreted narrowly and against the insurer. The bankruptcy court is correct, USAG argues, that if Liberty wanted to impute Nassar's acts to USAG, as the drafter of the policy it could have done so, yet the policy contains no express imputation.

As noted above, an insurance policy's language is interpreted according to the plain meaning of its terms. *See Beam*, 765 N.E2d at 528. The anti-imputation clause only bars imputing the wrongful conduct of one "**Insured Person**" to another "**Insured Person**." Under the policy's definitions, USAG qualifies as "any **Insured**," and is the "**Insured Organization.**" But USAG is not an "**Insured Person**." The policy's definitions limit "**Insured Person**" to "one or more natural persons who were, now are, or shall hereafter be elected or appointed directors, trustees, officers, employees, committee members or volunteers of the **Insured Organization** … ." USAG does not fall within this definition, and thus would not qualify for this carve-back which brings some otherwise excluded claims back into the policy.

The anti-imputation clause could have been drafted to apply to "any other *Insured*" rather than how it was drafted—to not impute the wrongful act to "any other **Insured Person**." The policy's use of "**Insured Person**" must be read plainly, thus excluding USAG's reading that would have us rewrite the insurance contract, which we cannot do. *Estate of Eberhard*

*v. Ill. Founders Ins. Co.*, 742 N.E.2d 1, 2 (Ind. Ct. App. 2000) (citations omitted). Our reading also follows logically—because of the carve-back, the policy provides coverage to an innocent "**Insured Person,**" but not to USAG, for which all "**Insured Persons**" work or provide services.

USAG is an "**Insured Organization**" but not an "**Insured Person**" under the policy, so the anti-imputation clause in the wrongful conduct exclusion does not bar the imputation of Nassar's wrongful conduct to USAG.

\*       \*       \*

In summary as to the wrongful conduct exclusion, Indiana law requires that an exclusionary clause be clear, precise, and specific as to the conduct it precludes. *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012. "Any **Insured**" is broad, yet clear in its meaning, so it does not admit of ambiguity, contrary to the bankruptcy court's conclusion. The wrongful conduct that was finally adjudicated included the ten counts on which Nassar pleaded guilty and was sentenced, but the remainder of his scores of charged and uncharged acts of sexual abuse were not finally adjudicated. So only a small portion of Nassar's wrongful conduct satisfies the wrongful conduct exclusion's "finally adjudicated" clause.

The policy excludes coverage for a claim that is "based upon, arising from, or in any way related to" wrongful conduct. While the plain meaning of that clause includes a logical connection between the claim and the insured's wrongful acts, it is not cabined to causal relationships. Rather, we conclude that the phrase "in any way related to" is ambiguous as applied to these facts, and it should therefore be construed in favor of the insured. Case law is not to the contrary, and the

larger implications of this interpretation for the insurance industry also counsel this reading. The wrongful conduct exclusion's anti-imputation, or carve-back, clause removes any imputation only as to a natural person, not an organization like USAG.

So, the wrongful conduct exclusion applies but only to the ten claims for which Nassar was found guilty, and not to the remaining Nassar-related claims, for which Liberty must provide insurance coverage.

## IV. Bodily Injury Exclusion

Liberty's next defense relies on a policy provision that the insurer argues excludes the athlete lawsuits—a subset of the Nassar-related claims—by hundreds of gymnasts seeking to hold USAG responsible for allowing the abuse to take place, causing them to suffer physical, mental, and emotional damage. The policy excludes claims "made against any insured for: (a) **bodily injury**, sickness, disease, death; or (b) **emotional distress**, mental anguish …" But an exception provides that part (b) of the exclusion "shall not apply to any claim brought by or on behalf of any Third Person, or any past, present, or prospective Insured Person for an Employment Practices Wrongful Act." The parties dispute the scope of this exclusion.

The bankruptcy court held that the bodily injury exclusion did not apply for multiple reasons, including because the exception specifies that the exclusion does not apply to emotional distress claims brought by third parties. We review the bankruptcy court's summary judgment decision de novo, and Indiana authority on the general principles for the interpretation of insurance contracts, described above, apply.

We are to give unambiguous policy language "its plain and ordinary meaning." *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012. Applying that rule to the exclusion and the exception, we conclude that the exception does apply, so the claims are not excluded to the extent they seek recovery for emotional distress, mental anguish, and the like. The comma in the exception—after "Third Person" and before "or any past, present, or prospective Insured Person"—is disjunctive. If the remainder of that clause—"for an Employment Practices Wrongful Act"—were read to modify the entirety of "any Third Person, or any past, present, or prospective Insured Person," the exclusion would bar every emotional-distress claim by any person. That would be a strange and oddly specific way of saying "any person." Such an interpretation would also nullify the entirety of part (b) of the exclusion, as a contract would not include a clause that two lines later is entirely nullified by another clause.

The only reasonable interpretation of the exception is that part (b) of the exclusion shall not apply to any claim brought by or on behalf of any third person, or any past, present, or prospective insured person for an employment practices wrongful act. The exception to the bodily injury exclusion is written broadly, so it is applied broadly. So, the exception requiring coverage for an Employment Practices Wrongful Act would apply to the "athlete lawsuits," the bodily injury exclusion would not apply, and the exclusion would not relieve Liberty of its duty to defend those lawsuits.

Because the duty to defend applies even to claims that in part seek excluded relief, Liberty would have a duty to defend the athlete lawsuits seeking relief for emotional distress and/or mental anguish. Further, a potential argument

from Liberty that the exception applies only to third-party emotional distress claims for an Employment Practices Wrongful Act was never raised before the bankruptcy court. The bodily injury exclusion therefore does not relieve Liberty of its duty to defend the athlete lawsuits.

## V. Coverage for Investigations and Other Matters

The parties also disagree about whether the policy covers claims for non-compulsory investigations and information gathering that did not specifically allege USAG committed a wrongful act. Two issues comprise this disagreement: (1) whether the Congressional and USOPC investigations were "formal investigations" or "formal proceedings" such that they satisfy the definition of a "claim" under the policy; and (2) whether the White deposition and investigation matters were "for a Wrongful Act."

The bankruptcy court ruled that the investigations were formal and therefore claims, but it did not speak to the second issue. We review that court's decision on summary judgment de novo.

Under the policy, "'**Claim**' means:

> (a) a written demand for monetary or non-monetary relief against an **Insured**;

> (b) the commencement of a civil or criminal judicial proceeding or arbitration against an **Insured**;

> (c) the commencement of a formal criminal, administrative or regulatory proceeding or formal investigation against an **Insured**, including any

brought before the Equal Employment Oppor-
tunity Commission or any similar state, local or
territorial governmental agency;

…

"'**Wrongful Act**' means:

(a) any actual or alleged error, misstatement,
misleading statement, act, omission, neglect, or
breach of duty, or **Employment Practices
Wrongful Act** committed or attempted by the
**Insured Persons** in their capacities as such or by
the **Insured Organization**; or

(b) any matter claimed against the **Insured Per-
sons** solely by reason of their status as **Insured
Persons**.

Liberty argues that even if congressional investigations
are "formal," they are not all necessarily "formal investiga-
tions" or "formal proceedings" (as the policy requires)
because they do not involve compulsory actions and involun-
tary requests for information. The Congressional investiga-
tion letter stated that Congress was "seeking" or "inviting"
information from USAG, not requiring it.

Further, to Liberty, the investigations and the White dep-
osition matter were not "for a Wrongful Act," at least during
the claims period. Liberty cites two unpublished decisions
from other circuits, which say that investigations into merely
*whether* a wrongful act occurred are not investigations of a
wrongful act, because they lack an affirmative accusation of

misconduct.[10] Liberty argues the investigations did not allege any violations by USAG. Rather, they sought information about Nassar's underlying conduct, and at most contemplated that USAG had done something that might later result in an allegation.

USAG responds that the investigations were "formal" and that they concerned a "wrongful act," as those terms and phrases are used in the policy. USAG distinguishes Liberty's authority that purports to show that "formal" requires compulsory and involuntariness. Subsequent decisions have noted that in those unpublished decisions the notices at issue explicitly disclaimed any wrongdoing. *E.g.*, *Oceans Healthcare, LLC v. Ill. Union Ins. Co.*, 379 F. Supp. 3d 554, 562–63 (E.D. Tex. 2019). And other courts have rejected Liberty's argument completely. For example, the First Circuit has held that "allege" is not "in and of itself so clearly restrictive that simply by virtue of that word" an initiating document must explicitly accuse someone of wrongdoing. *BioChemics, Inc. v. AXIS Reins. Co.*, 924 F.3d 633, 643–44 (1st Cir. 2019).

USAG has the better of both these issues. The Congressional and USOPC investigations were "formal proceedings" or "formal investigations." The claims made in those proceedings were adversarial, and they raised the specter of misconduct by USAG, resulting in very serious harm to hundreds of girls and women. "Formal" has been defined as "[o]f, relating to, or involving establishing procedural rules, customs, and practices." GARNER, BLACK'S LAW DICTIONARY (11th ed. 2019).

---

[10] *MusclePharm Corp. v. Liberty Ins. Underwriters*, 712 F. App'x 745, 749–50, 756 (10th Cir. 2017); *Emplr's Fire Ins. Co. v. Promedica Health Sys.*, 524 F. App'x 241, 243, 247–250 (6th Cir. 2013).

"Formal" does not have to mean coercive. It can refer to the investigation being carried out according to established rules and procedures, which these investigations were.

As for a "wrongful act," the USOPC investigation led to a quasi-judicial action brought by the USOPC before itself and against USAG. Additionally, the Congressional investigation accused USAG of misconduct, and the fact that the request for information was technically voluntary says little considering that subpoenas were almost certain to follow any refusal to cooperate. The Congressional letters were coercive, and USAG effectively had no choice but to cooperate, either voluntarily or by force of law. The U.S. Senate letter states, "recent reports and revelations … provide ample evidence that USAG and MSU were negligent in acting on reports of Nassar's abuse …" and then lists specific allegations. The U.S. House letter also strongly suggests that USAG acted wrongfully. "[A] lack of action allowed Nassar's offenses to infect nearly every level of gymnastics" … "USA Gymnastics … is at the center of many of these failures" … "[USAG] has a significant responsibility to its sport and athletes … Yet, the organization's team doctor sexually abused young gymnasts unfettered for years."

The Indiana Attorney General's investigation was also accusatory. It opened with a letter stating he believed USAG was

> in possession … of documentary material or may have knowledge of a fact that is relevant to an investigation … to determine whether (1) [USAG] has exceeded or abused the authority conferred on the corporation by law … (2) whether any corporate officer has violated his or

> her duties under Ind. Code § 23-17-14-2 … or …
> Ind. Code § 23-17-13.

The Attorney General's letter then demanded that USAG produce its rules and policies, records of background checks, information how sexual abuse complaints were handled, and other items.

Even by Liberty's interpretations, the claims here concerned formal proceedings that investigated wrongful acts. The same is true for the deposition of the USAG employee, Amy White, and testimony in one of the lawsuits, which were both formal proceedings involving the same wrongful acts. We agree with USAG that insurance coverage exists for these investigations and proceedings.

## VI. EPL Sublimit

In addition to an overall liability limit of $5 million, the policy here includes a $250,000 sublimit endorsement for "Third Party EPL." The parties dispute whether this sublimit applies.[11] The bankruptcy court found that it did not, and thus ruled against Liberty, but for a reason that was not argued. That court concluded that because the policy does not define "Third Party EPL," and the term does not have a common meaning, it is ambiguous and void of legal effect.

We agree with Liberty that "Third Party EPL," although not defined in the policy, is a term of art in the insurance

---

[11] USAG suggests that Liberty waived appellate review of this point. But in Liberty's objections to the proposed findings and conclusions in the bankruptcy court, the insurer argued that "EPL" is a term of art with a clear meaning in the insurance industry, and that the parties' course of conduct in prior policies clarified the term's meaning. So, this argument is not waived.

industry. "EPL" stands for "Employment Practices Liability." Although Liberty offered the bankruptcy court additional evidence to interpret this endorsement, the bankruptcy court did not consider it. That decision was incorrect. In *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049 (Ind. 2001), the Indiana Supreme Court concluded that "[e]vidence of industry practice is admissible to construe terms of art or ambiguous agreements." *Id*. at 1059 (citing, *inter alia*, 2 RUSS AND SEGALLA, COUCH ON INSURANCE § 22.49 (3d ed. 1995)). The bankruptcy court should have considered the extrinsic evidence offered as to the use and meaning of "Third Party EPL" in this policy endorsement.

With this type of insurance term of art, used in a policy in which the parties have a history of negotiating the terms of coverage, parol evidence should be allowed and considered, *see Dana*, 759 N.E.2d at 1059–60; *Cummins, Inc. v. Ace Am. Ins. Co.*, No. 1:09-CV-00738-JMS, 2011 WL 130158, at *6 (S.D. Ind. Jan. 14, 2011) (citing *Dana* for the same proposition), at least in a case involving a sophisticated insured that was able to negotiate the scope of the relevant coverage, notwithstanding the general principle that ambiguities are construed in favor of the insured. *Everett Cash Mut. Ins. Co.*, 926 N.E.2d at 1012. There may be a $250,000 aggregate limit for some or all of the covered claims, subject to what the actual extrinsic evidence shows about the parties' conduct and what the term they inserted into the policy meant. Because more fact finding is required to resolve this question, this portion of the case is remanded to the district court for that to be accomplished.

## VII.  Conclusion

None of the activities before the policy period amounted to a claim under the policy, and the district court did not

abuse its discretion when it decided not to hear additional evidence in its review of the bankruptcy court's proposed findings and conclusions. So that portion of the January 13, 2020 order is AFFIRMED.

The policy's wrongful conduct exclusion applies to only the ten claims for which Nassar was found guilty, and not to the remaining Nassar-related claims, for which Liberty must provide insurance coverage. And the policy's bodily injury exclusion does not relieve Liberty of its duty to defend the athlete lawsuits. Further, the policy provides coverage for expenses and costs related to the various investigations and other matters. The district court's ruling for USAG that the conduct exclusion does not apply to most of the Nassar-related claims is thus also AFFIRMED, albeit under partially different reasoning.

Finally, the bankruptcy court should have considered the extrinsic evidence offered as to the use and meaning of the "Third Party EPL" $250,000 sublimit in the policy. Accordingly, that portion of its ruling is REVERSED, and this case is REMANDED to the district court and bankruptcy court for those proceedings.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part.

I largely agree with the per curiam opinion's analysis and resolution of the issues presented in this complex appeal. I respectfully part ways with my colleagues regarding only one portion of the opinion—its evaluation of the phrase "based upon, arising from, or in any way related to" in the wrongful conduct exclusion. Per Curiam Op. § III.D.3–5.

The opinion notes that a wrongful conduct exclusion in a D&O policy typically precludes coverage for criminal acts. Nassar's repeated sexual assaults and sexual abuse indisputably satisfy this requirement. The opinion also correctly concludes that the clause in the wrongful conduct exclusion naming to whom it applies—"any **Insured**"—is not ambiguous. I further agree that a causal connection is not required for a claim to be "in any way related to" wrongful conduct. Rather, "related to" includes most logical connections. My limited disagreement centers on how close that logical connection must be for claims to be "in any way related to" one another.

The plain meaning of "in any way related to" includes a logical connection between a claim and an insured's wrongful conduct. But the opinion concludes that the logical connection between the Nassar-related claims and Nassar's criminal convictions does not render them "in any way related to" each other. To me, the heavy weight of case law sets that degree of logical connection and provides that "related to" is not ambiguous. Because the facts here satisfy that unambiguous definition, I conclude that the wrongful conduct exclusion applies to all the Nassar-related conduct.

"Related to" includes a broad range of connections under Indiana law. *See Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989); *RLI Ins. Co. v. Conseco, Inc.*, 543 F.3d 384, 391 (7th Cir. 2008). In *Gregory*, the court held that claims were related which flowed from an attorney's alleged errors in analyzing the tax consequences of buying videotapes and preparing an opinion letter which said videotapes were not securities. *See* 876 F.2d at 603–06. The breadth of "related," as that term was used in *Gregory*, has not been confined to that decision's facts. Rather, courts have cited *Gregory* across factual contexts and interpreted the term "related" within an insurance policy to be broad but not ambiguous. *Gregory* has been cited by federal and state courts *more than seventy times*. Most of those decisions cite *Gregory* with approval for the concept that "related" is defined broadly within an insurance policy to unambiguously include causal and logical relationships. These decisions typically hold that "related" covers the conduct alleged in the underlying lawsuits in those cases. Although some cases distinguish *Gregory* and find a lack of relatedness or ambiguity, *see, e.g.*, *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167, 1176–77 (Conn. 2014), nearly all the decisions referencing *Gregory* cite it as standing for the broad interpretation of "related."

Two state supreme court decisions interpreting the term "related" support this interpretation from *Gregory*. In the first, *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263 (Cal. 1993), the Supreme Court of California interpreted a provision of a professional-liability policy that treated multiple claims as a single claim where the claims arose out of "a series of related acts, error or omissions." *Id*. at 1270. In interpreting that phrase, the court in *Bay Cities* endorsed *Gregory*'s conception of "related" as encompassing

"both logical and causal connections." *See id*. at 1274. "Restricting the word to only causal connections improperly limits the word to less than its general meaning. 'Related' is a broad word, but it is not therefore a necessarily ambiguous word." *Id*. The court in *Bay Cities* then concluded that the term "series of related acts, errors or omissions" unambiguously applied to the insured's two omissions in that case. *See id*.

The Supreme Court of California correctly reasoned that "related" extends beyond the facts of *Gregory* and those of *Bay Cities* itself. As that court stated, "[m]ultiple or broad meanings do not necessarily create ambiguity." *Id*. at 1271. The *Bay Cities* court also offered an apt analogy. Assume an insurance policy excluded coverage for any claim arising from the operation of a "motor vehicle." Obviously, a "motor vehicle" could be either an automobile or a truck, but that does not mean it must be only one or the other, rather than both. Likewise, the fact that "related" can encompass a wide variety of relationships does not necessarily render the word ambiguous. To the contrary, a word with a broad meaning, or multiple meanings, may be used for that very reason—its breadth—to achieve a broad purpose. *Id*.

Another state supreme court interpreted a policy's limitation on liability for loss or damage "[i]nvolving a series of related acts," similar to the phrase in *Bay Cities*. The Minnesota Supreme Court applied *Gregory* and *Bay Cities*, holding that phrase unambiguously limited the insurer's liability, in *Am.*

*Com. Ins. Brokers, Inc. v. Minnesota Mut. Fire & Cas. Co.*, 551 N.W.2d 224 (Minn. 1996).[1]

There, an insured business's employee committed 155 distinct acts of embezzlement, using two modus operandi: taking funds received from customers as insurance premiums and issuing unauthorized checks. *Id*. at 229–30. Citing *Gregory*, the court stated: "[w]e cannot so restrict the plain and ordinary meaning of the word 'related' such that acts of embezzlement which follow each other in time, take place at the same business, and are committed by the same employee are not 'related' as that word is commonly used." *Id*. at 228. In determining whether wrongful acts are part of a "series of related acts," the court further held that factors such as "whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi" should be considered. *Id*. at 231.

This case law defines, unambiguously, the appropriate logical connection between claims such that they are "related to" one another in some manner. Applying that understanding to the facts here demonstrates that there is an unequivocal, non-tenuous logical connection between those criminal acts for which Nassar was convicted and sentenced and the rest of Nassar's sexual assaults and sexual abuse.

---

[1] 551 N.W.2d at 228: "As stated in *Gregory*, the common understanding of the word "related" covers a very broad range of connections, both logical and causal. 876 F.2d at 606 … The relationship between [the employee]'s acts of embezzlement is not so 'attenuated or unusual' that American Commerce could not have expected that the acts would be treated as somehow being related. *See Bay Cities*, 855 P.2d at 1275; *Gregory*, 876 F.2d at 606. We therefore conclude that the phrase 'series of related acts' as used in the policy in this case is not ambiguous."

All the crimes to which Nassar pleaded guilty and for which he was sentenced were for first degree criminal sexual conduct in violation of Michigan Combined Law 750.520b. All the victims in these ten convictions were under 13 years of age, or between 13 and 15 years of age. The plea agreements in each county recite the factual bases for each of the ten crimes; all those facts are the same as in the remainder of his sexual abuse—digital sexual penetration—and the plea agreements use identical language for each count.

All the claims for Nassar's assaults of hundreds of female athletes share identical characteristics with his ten convictions for criminal sexual abuse. All Nassar's sexual molestations involved the same perpetrator. All victims were girls or young women, and all gymnasts. All the victims visited Nassar under the guise of medical treatment, and in all Nassar's sexual abuse he exploited his position as a physician. These highly similarly-situated victims saw Nassar under a purported "doctor–patient" relationship, which was actually between perpetrator and victim. All Nassar's sexual abuse occurred during his volunteering for the USAG, and all his sexual assaults were perpetrated with the same modus operandi, as described in detail in an independent investigation report.

As *Gregory* states, "[a]t some point, of course, a logical connection may be too tenuous reasonably to be called a relationship." 876 F.2d at 606. So, it is not the strength of the relationship between the claims, but whether that connection is "too tenuous" to fairly be called a relationship at all. The question is how attenuated must the connection be before the claimed or alleged relationship breaks down and ambiguity is created. *See, e.g., Highwoods Props., Inc. v. Exec. Risk Indem., Inc.*, No. 03-0077-CV-W-NKL, 2004 WL 4986355, at *10 (W.D.

Mo. May 11, 2004), *aff'd*, 407 F.3d 917 (8th Cir. 2005) (relying on *Gregory* and concluding that a similarly worded exclusion applied to multiple claims that arose out of a single corporate takeover where "each maneuver was designed to" achieve the same outcome, even though all the operative facts and legal theories of each claim were not the same); *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693, 707 (E.D. Wis. 2005) (citing the "too tenuous" language from *Gregory* and holding that dozens of claims were "clearly 'related' in any meaningful sense of the word" because they were all based on the insured's unified, nationwide business practice in underwriting insurance policies, even though the plaintiffs, venues, and dates in each lawsuit were different). Because there is a logical relationship between the ten criminal counts to which Nassar pleaded guilty and all his sexual abuse and molestations, the wrongful conduct exclusion unambiguously bars coverage.

The *Bay Cities* decision is correct that "related" in an insurance policy—where not specifically defined—includes logical relationships, as stated in *Gregory* and *RLI Ins.* The use of "in any way related to" in the policy Liberty issued to USAG is not ambiguous and covers logical relationships, in accordance with the "broad purpose" alluded to in *Bay Cities*. Indeed, the per curiam opinion properly points out that the phrase "based upon, arising from, or in any way related to" is used five times in the policy when delineating claim exclusions, plus four more times in an endorsement to the policy that adds further exclusions. Every time that phrase introduces an exclusion, this language broadens the circumstances that fall within it. So, these sophisticated parties, in negotiating this policy, agreed upon and included this phrase nine times, in each instance to broaden the scope of an exclusion.

The Minnesota Supreme Court's analysis in *Am. Com. Ins. Brokers, Inc.* is also persuasive. There is no reason to interpret a provision excluding coverage for a claim that is "in any way related to" wrongful acts differently from a provision limiting coverage for a "series of related acts." If one wrongful act is part of a "series of related acts," as in *Am. Com. Ins. Brokers, Inc.*, a claim for coverage of a lawsuit alleging the one wrongful act is necessarily "in any way related to" the insured's prior wrongful acts that form part of a series of related acts. As that court correctly concluded, whether a common "method or modus operandi" was used is a crucial factor in determining whether wrongful acts are related. 551 N.W.2d at 231. All the Nassar-related conduct included precisely the same method and modus operandi—abuse of young, vulnerable, female gymnasts under the guise of medical treatment— for the ten crimes acts of which he was convicted as well as for all his other sexual abuse.

"Related to" under Indiana law, therefore, includes not just the ten counts in the two Michigan state criminal cases, but all the claims logically connected to them, which comprise Nassar's sexually abusive conduct. Given the tight similarities involved in all this sexual abuse, there is no reasonable interpretation of the insurance contract under which the Nassar-related claims would not be "in any way related to" the ten criminal counts for which Nassar was finally adjudicated guilty. At no point has USAG advanced—or explained the contours of and analysis supporting—the purportedly reasonable alternative interpretation that is required, under Indiana law, to give rise to ambiguity.

Nassar's acts targeted hundreds of victims. But that is not a distinguishing criterion when interpreting the wrongful

conduct exclusion. Several courts have determined that the fact that an insured's acts impact different victims does not create an ambiguity regarding whether those acts are logically connected. Instead, a common perpetrator and a common modus operandi have unambiguously given rise to related acts. *See, e.g., Kilcher v. Cont'l Cas. Co.*, 747 F.3d 983, 989–90 (8th Cir. 2014) (acts done to different victims were unambiguously "logically … connected," as defined in the insurance policy, where each victim shared common characteristics such that he or she "presented the same opportunity" to the perpetrator). In that case, modus operandi was a key consideration in determining there was no ambiguity. *Id.*; *see also Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1263–64 (11th Cir. 2000) (acts done to different victims through a common modus operandi unambiguously constituted "related wrongful acts" because there was a logical connection between them, despite the fact that the wrongful acts "resulted in a number of different harms to different persons").

This analysis is also supported by the Eleventh Circuit's decision in *HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309 (11th Cir. 2008). The policy at issue in that case had an exclusion for "prior litigation" that was "based upon, arising from, or in any way related to" any "demand, suit, or other proceeding against any Insured which was pending on or existed prior to the applicable Prior Litigation Date specified by endorsement to this Policy, or the same or substantially the same facts, circumstances or allegations which are the subject of or the basis for such demand, suit, or other proceeding." *Id.* at 1312.

The question in *HR Acquisition I Corp.*, under Alabama law, was whether a false claim *qui tam* action was "in any way

related" to a shareholder derivative suit for purposes of the exclusion. The Eleventh Circuit concluded that the exclusion was not ambiguous, and that the lawsuits were related. *Id.* at 1315–16. The court explained that "in any way related to" is "very broad language" that presents a "low standard," so it was not necessary for the same transactions to be alleged in both lawsuits for those lawsuits to be "in any way related." *Id*. at 1316. That the same defendant was sued in both lawsuits "for the same type of wrongdoing" was "certainly" enough to meet the "low standard" of "in any way related." *Id*. Because the exclusion required only that the suits be "in any way related to" each other, the fact that they involved different plaintiffs and different theories of recovery did not change the result. *Id*.

The same is true here, where the wrongful conduct exclusion uses the identical phrase to exclude coverage for claims "based upon, arising from, or in any way related to" an insured's wrongful conduct. As in *HR Acquisition I Corp.*, Nassar—the same perpetrator—used the same modus operandi by using his position of trust as a doctor to abuse vulnerable athletes. The Nassar-related claims allege those same wrongful acts, and they share both a common perpetrator and a common modus operandi with the ten acts that all agree were finally adjudicated.

The per curiam opinion concludes that the cases cited above present more straightforward facts than the difficult circumstances of this case; in my colleagues' view, this case is unique. It is true that the scope of Nassar's abuse and victimization is enormous. But as a court we must play the cards—here, the text of the insurance policy and the precedents that have interpreted identical or nearly identical language—we

are dealt. Deep research has revealed the contours of "relat-edness" in the law, including the logical connection identified above. Notwithstanding the challenging facts here, we must discern and apply the available law.

Although the per curiam opinion warns of the unforeseen consequences of applying the plain language of "in any way related" to the facts of this case, Per Curiam Op. § III.D.3, I do not agree that such considerations should drive our analysis. As an analogy, in matters of statutory interpretation, federal courts must refuse "to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome." *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 134 (2015) (ci-tation omitted). Likewise, when construing an insurance con-tract under state law, we should not interpret its terms to avoid what is deemed a harsh result—here, for the insured, but potentially for insurers in a future case. *See* Per Curiam Op. § III.D.3. Instead, we must apply the relevant legal prin-ciples to the specific contractual provision at issue. In this case, regardless of the outcome that follows, the contractual provision excluding coverage for claims that are "in any way related to" the finally adjudicated wrongful conduct of an in-sured "means what it says." *Wisniewski v. Bennett*, 716 N.E.2d 892, 897 (Ind. 1999).

As the per curiam opinion recognizes, the failure to define a term or phrase in an insurance policy does not necessarily render that policy language ambiguous. Instead, an ambigu-ity exists only "where the provision is susceptible to more than one reasonable interpretation." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997) (citation omitted); *accord Am. Home Assur. Co. v. Allen*, 814 N.E.2d 662, 666–67 (Ind. Ct. App. 2004) (citing *Guzorek*, 690 N.E.2d at 667). USAG has

not advanced a reasonable interpretation of the wrongful conduct exclusion under which the claims for coverage of the Nassar related claims would not be "in any way related to" the ten counts of sexual abuse for which Nassar was finally adjudicated guilty. The phrase "based upon, arising from, or in any way related to" thus is not ambiguous.

There is another aspect to this debate. If this claims-made D&O policy is a mismatch for this type of tremendously difficult and challenging loss, perhaps it is because USGA is trying, per the idiom, to "put a round peg in a square hole." A mismatch between complex factual circumstances and policy language does not mean that language is ambiguous or must be viewed from the standpoint of the insured. The factual distinguishability of this case from the other decisions determining the scope of "related to" should be a signal that a claim has been made seeking coverage on a policy that is designed for circumstances far different than those presented here. Recall, Liberty is one of many insurers USGA sued, and the bankruptcy litigation implicates numerous insurance policies issued by those companies. That this specific policy, including its particular wrongful conduct exclusion, does not fit these facts does not mean that coverage follows.

Court decisions interpreting "related" in insurance policies, across a wide variety of contexts, support this analysis and the conclusion that the wrongful conduct exclusion's language is unambiguous and applies to claims "based upon, arising from or in any way related to" Nassar's sexual abuse that was finally adjudicated in his guilty pleas and for which he was sentenced. So, I CONCUR with the per curiam opinion, except that I respectfully DISSENT from § III.D.3–5. I would conclude that the wrongful conduct exclusion in the

insurance policy applies to all the Nassar-related conduct, thus requiring judgment to be entered for Liberty.